834 P.2d 304

**Glen R. BLACK and Peggy A. Black, husband and wife, Plaintiffs–Appellants,**

v.

**Lawrence J. YOUNG, Mayor of the City of Ketchum, Idaho; Thomas F. Held, Suzanne Orb, Guy P. Coles, and Susan H. Wolford, individually and in their capacities as City Councilmen of the City of Ketchum, Idaho; the City Council of Ketchum, Idaho; and the City of Ketchum, Idaho, Defendants–Respondents.**

No. 19294.

Supreme Court of Idaho,
Twin Falls, April 1992 Term.

July 10, 1992.

tent court or tribunal shall be the rate of five percent (5%) plus the base rate."

James T. Jones, Boise, for plaintiffs-appellants.

Lawson, Peebles, Ballard & Edsson, Ketchum, for defendants-respondents. Edward A. Lawson, argued.

McDEVITT, Justice.

## BACKGROUND

In August of 1987, the Blacks purchased a portion of a city block located in the City of Ketchum. An alley ran through the middle of the city block, and the Blacks owned property on both sides of the alley. This alley had been blocked off on one end by the only other property owner on the block. The Blacks intended to build a motel on this property.

On November 30, 1987, the Blacks applied to the Ketchum Planning and Zoning Commission ("Commission") for vacation of the portion of the alley that runs adjacent to their property. The Commission recommended that the Ketchum City Council ("City Council") vacate the alley.

On December 21, 1987, the matter came up before the City Council. After some discussion, the City Council tabled the matter for a special session to be held on December 29, 1987.

On December 29, 1987, the City Council took up the matter again in special session. At this meeting, the Blacks offered the

City of Ketchum $5,000.00, an old log cabin on the property, and any salvageable material from the service station located on the property.

On January 18, 1988, the City Council took up the matter again. After some discussion, the City Council tabled Ordinance Number 471, the proposed ordinance to vacate the alley.

On February 1, 1988, the City Council again took up consideration of the proposed ordinance. At this meeting, the Blacks expressed concerns about the proposed ordinance. Specifically, the Blacks were concerned with the vacation of the alley being tied to approval of the design of the project and that the alley would not be vacated until the City of Ketchum issued a certificate of occupancy for the motel. The matter was tabled again.

On February 16, 1988, the City Council met and discussed the Black's redesign of the motel project. The Blacks remained firm that the City Council's requirements for vacation of the alley were unacceptable to them.

On April 4, 1988, and after submission of the design plan, the City Council unanimously adopted Ordinance Number 471.[1]

1. The ordinance reads in full:

ORDINANCE NUMBER 471

AN ORDINANCE OF THE CITY OF KETCHUM, BLAINE COUNTY, IDAHO, VACATING THAT PORTION OF THE ALLEY RUNNING THROUGH BLOCK 1 ADJACENT TO LOTS 1, 2, 3, 5, 6, AND 7, THEREOF, AS SHOWN ON THE PLAT OF THE ORIGINAL TOWNSITE OF KETCHUM; AND, ORDERING CONVEYANCE TO ADJACENT PROPERTY OWNER; PROVIDING A REPEALER CLAUSE; PROVIDING A SAVINGS AND SEVERABILITY CLAUSE; AND, PROVIDING AN EFFECTIVE DATE.

BE IT ORDERED BY THE MAYOR AND CITY COUNCIL OF THE CITY OF KETCHUM, BLAINE COUNTY, IDAHO:

SECTION 1. That upon the Ketchum City Council having obtained the written consent to said vacation from the property owners adjoining said portion of the alley running through Block 1 of Ketchum Townsite adjacent to Lots 1, 2, 3, 5, 6, and 7, thereof, and having held a public hearing before the Ketchum City Council upon notice as required by law, it is found by the Ketchum City Council to be in the best interest of the City of Ketchum and for the public good and convenience, provided that the motel for which the Ketchum Planning and Zoning Commission granted design review approval under plan number CR–88–002 is built, that said portion of said alley hereinafter described be vacated; that no damage results to any adjoining property owners or anyone else; that provided said motel is constructed there is no need for said portion of said alley as a public thoroughfare as properties on all sides of said alley has never been opened, improved or maintained within the platted right-of-way by the City of Ketchum and to do so would be unnecessary; and, that vehicular circulation in the vicinity is in no way affected by said vacation.

SECTION 2. That effective upon the issuance of a building permit for the motel approved by the Ketchum Planning and Zoning Commission under plan number CR–88–002, and the funding of a loan in the amount of at least $2,500,000 from an institutional lender to pay the cost of constructing the said motel, the portion of the alley running through Block 1, as shown on the Official Plat of the Original Townsite of Ketchum, Idaho, being more particularly described as the one hundred sixty-five feet (165') in length and twenty feet (20') in width of said alley adjacent to Lots 1, 2, 3, 5, 6, and 7, Block 1, Official Plat of the Original Townsite of Ketchum IS HEREBY VACATED, save and except that this grant is made subject to the right of reversion described in this section 2, and all existing easements, franchise and utility rights and other encumbrances of record. In the event that a certificate of occupancy for the said motel is not issued before the right to a certificate of occupancy has expired, then the title to the real property vacated by this ordinance shall revert to and rest absolutely in the City of Ketchum without further action or notice on the part of the City of Ketchum and shall automatically constitute a rededication of the property vacated by this ordinance as an alley, and all rights secured under this ordinance shall automatically become null and void. Upon request, the City of Ketchum agrees to subordinate its reversionary interest to a lien in favor of an institutional lender to secure a loan the proceeds of which will be used exclusively to pay the cost of constructing the said motel.

SECTION 3. Title to the real property vacated by this ordinance shall, subject to the right of reversion contained in Section 2, above, revert to the owners of record of the adjoining Lots 1, 2, 3, 5, 6, and 7, Block 1, Ketchum Townsite upon the issuance of a building permit for the motel approved by the Ketchum Planning and Zoning Commission under plan number CR–88–002 and the funding of a loan in the amount of at least $2,500,000 from an institutional lender to pay the cost of constructing the said motel. The said reversion of title shall be evidenced by the City of Ketchum executing a quitclaim deed of said vacated property thereby incorporating said vacated property into said adjoining lots.

SECTION 4. REPEALER CLAUSE. All ordinances or parts thereof in conflict herewith are hereby repealed.

SECTION 5. SAVINGS AND SEVERABILITY CLAUSE. If any section, paragraph, sentence

Sections 2 and 3 of Ordinance Number 471 conditioned vacation of the alley upon the issuance of a building permit and the funding of a construction loan in the amount of $2,500,000.00. In addition, Ordinance Number 471 §§ 2 and 3 gave the City of Ketchum a right of reversion if a certificate of occupancy was not issued for the motel. On the same day, the Blacks signed an estoppel affidavit which provided that the conditions of the ordinance were acceptable to them and would not be challenged by them.

On August 1, 1988, the City Council considered and approved a one year extension of time for the Blacks to apply for a building permit.

The Commission approved the revised plans for the motel, including reduced underground parking spaces and increased above-ground parking spaces. The City Planning Department appealed this decision to the City Council. The appeal came up on May 15, 1989. After this hearing, the City Council reversed the decision of the Commission.

On December 4, 1989, the Blacks presented new plans for the project to the City Council. Without vote, the City Council advised the Blacks that the new plans were unacceptable. The focus was on the lack of underground parking in the new plan.

On February 20, 1990, the City Council again took up the matter, this time discussing with the Blacks the parking arrangements. The parties scheduled a work session for a later date.

On March 7, 1990, the work session was held. However, on June 18, 1990, the City Council denied the Commission's recommendation to approve the new plan.

**PROCEDURE**

On December 3, 1990, the Blacks filed a complaint against the mayor and city council members of the City of Ketchum. The complaint described the property in question, alleged that the mayor and city council members enacted Ordinance Number 471, that § 2 of Ordinance Number 471 was *ultra vires*, that the defendant's requirement that the Blacks sign an estoppel affidavit was *ultra vires*, that the right of reversion contained in Ordinance Number 471 was *ultra vires*, and that these conditions were *ultra vires* because of I.C. § 50–311. The Blacks prayed for title to the property, delivery of a quitclaim deed from defendants, and costs and fees, including development costs.

On December 21, 1990, the Blacks filed an amended complaint. The only change in the amended complaint was the addition of the City Council of Ketchum and the City of Ketchum as defendants. These new defendants, along with the original defendants, comprise the respondents, City of Ketchum.

On January 29, 1991, the original defendants filed an answer to the complaint. In the answer, the original defendants listed nine affirmative defenses: (1) failure to state a claim; (2) waiver; (3) estoppel; (4) consent; (5) laches; (6) failure to satisfy conditions precedent; (7) fraud; (8) authority of statute or ordinance; and (9) immunity.

Also on January 29, 1991, the original defendants filed a motion for summary judgment. In their motion for summary judgment, the original defendants asserted that the city has the authority to impose conditions upon ordinances to vacate streets or alleys, that the Blacks are estopped to deny the validity of the ordi-

or provision hereof of the application thereof to any particular circumstance shall ever be held invalid or unenforceable by a Court of competent jurisdiction, such decision shall not affect the remainder hereof, which shall continue in full force and effect and applicable to all circumstances to which it may validly apply.

SECTION 6. EFFECTIVE DATE. This ordinance shall become effective upon its passage, approval and publication according to law.

PASSED BY THE KETCHUM CITY COUNCIL and approved by the Mayor this 4th day of April, 1988.

/s/
Lawrence J. Young
Mayor

ATTEST:
/s/
Betty A. Coles
City Clerk

nance, and that the Blacks' claim is barred by I.C. § 67–6521(d). The original defendants also filed a supporting memorandum.

On January 31, 1991, the Blacks filed an application for the entry of default as to the City of Ketchum and the City Council. The application for the entry of default was filed pursuant to I.R.C.P. 55(a)(1). The district court entered an order granting the application on the same day conditioned upon proper service.

On February 11, 1991, the Blacks filed a motion for summary judgment. In their motion for summary judgment, the Blacks asserted that the City of Ketchum had no authority to impose conditions, that the conditions were *ultra vires,* in violation of I.C. § 50–311, that they were not estopped to deny the validity of the conditions, that the Local Planning Act does not bar their claim, and that the City of Ketchum did not plead fraud with particularity. The Blacks also filed a supporting memorandum.

On February 15, 1991, the Blacks filed a motion for the entry of default judgment against the City of Ketchum and the City Council. In addition, the Blacks filed a supporting memorandum, which stated "[a]s of February 11, 1991, neither the City Council of Ketchum nor the City of Ketchum has made an appearance or filed an answer in this matter."

On February 22, 1991, the City of Ketchum filed an amended answer to the complaint. The amended answer listed all parties comprising the respondents, City of Ketchum, as defendants.

After various supporting and opposing memorandums were filed, the district court entered an order denying the Blacks' motion for entry of default judgment, and granting the City of Ketchum's motion to set aside the entry of default.

On April 1, 1991, the district court entered its memorandum decision and order regarding the cross-motions for summary judgment. The district court denied the Blacks' motion for summary judgment and granted Ketchum's motion for summary judgment. In the memorandum decision and order, the district court reasoned as follows:

The Court finds that the parties in this action were competent and represented by counsel when they arrived at a meeting of the minds regarding the vacation of the alley in question. All legal and practical aspects of the agreement were negotiated in good faith, were agreed upon and were set forth in a contract that is clear and concise. The terms of the contract were set forth in Ketchum City Ordinance 471, section 2. Under the terms of this section the vacation of the alley was conditioned upon plaintiffs obtaining two specific items; a building permit for the motel approved under Plan No. CR–88–002, and the funding of a construction loan in the amount of at least $2,500,000.00. The Court finds that at the time of the hearing of these motions neither of the two conditions set forth in Ordinance 471, section 2 have been completed.

Plaintiffs now petition this Court to have their required performance under the contract waived while continuing to hold defendants to their agreed performance. The basis for the plaintiffs' position is that the City acted without the authority to impose such conditions on the vacation of the alley in question. If this position were sustained it would result in a financial windfall for plaintiffs, and an equal financial detriment to the City. Not only would the City suffer financially, but the health, safety and welfare of the citizens would be effected and deterred through the loss of a valuable thoroughfare. The Court finds that pursuant to statutory mandate the City was within its' authority imposing such conditions for the public good.

Plaintiffs have also attempted to convince the Court that the City sold the alley in question for the consideration of an old cabin of limited value. The Court finds that this transaction was not a part of the parties original contract as set forth in Ordinance 471, section 2. This transaction was separate and distinct from the parties original agreement.

Since plaintiffs have not performed their required obligations as set forth in

the contract, and these obligations were precursors to defendants' required vacation of the alley, the Court finds that defendants are not required to perform the described vacation, and that the parties are returned to the pre-contract status quo.

Thereafter, the Blacks filed a notice of appeal pursuant to I.A.R. 11(a)(1) "from the Memorandum Decision and Order filed April 1, 1991."

On May 7, 1991, the district court entered its judgment. In its judgment, the district court dismissed the Blacks' complaint in its entirety and retained jurisdiction for awarding costs and attorney fees.

The Blacks filed an amended notice of appeal on May 13, 1991, appealing from both the April 1, 1991 order and the May 7, 1991 judgment.

After a hearing held on June 10, 1991, the district court entered an amended judgment on June 12, 1991. In the amended judgment, the district court awarded the City of Ketchum costs in the amount of $694.03 and attorney fees in the amount of $8,297.25 with interest charged at a rate of 13.25% per annum.

## ANALYSIS

In order to resolve this appeal, we must address the following issues:

I. Are the conditions attached to the ordinance *ultra vires?*

II. Did the district court err in awarding attorney fees to the City of Ketchum?

2. This statute provides in full:

**50–311. Creation—Vacation of streets—Eminent domain—Reversion of vacated streets.—** Cities are empowered to: create, open, widen or extend any street, avenue, alley or lane, annul, vacate or discontinue the same whenever deemed expedient for the public good; to take private property for such purposes when deemed necessary, or for the purpose of giving right of way or other privileges to railroad companies, or for the purpose of erecting malls or commons; provided, however, that in all cases the city shall make adequate compensation therefor to the person or persons whose property shall be taken or injured thereby. The taking of property shall be as provided in title 7, chapter 7, Idaho Code. The amount of damages

## I.

### Are the Conditions Attached To The Ordinance *Ultra Vires?*

■ Ordinance Number 471, §§ 2 and 3, contains the following conditions:

1. Issuance of a building permit prior to vacation of the alley, and

2. Funding of a loan in the amount of at least $2,500,000.00 from an institutional lender to pay the cost of constructing the motel prior to vacation of the alley.

In addition, the ordinance gives the City of Ketchum a right of reversion to the alley if a certificate of occupancy is not issued before the right to a certificate of occupancy has expired.

The district court based its decision upon a contract theory. In concluding that the City of Ketchum had authority to impose the above-listed conditions upon the vacation ordinance, it essentially ruled that the ordinance was a contract between the City of Ketchum and the Blacks, that the above-listed conditions were conditions precedent to performance, *i.e.*, vacating the alley, by the City of Ketchum, and that the Blacks had not performed the conditions precedent. Therefore, the district court held that the City of Ketchum was excused from its performance and returned the Blacks and the City of Ketchum to the status quo. We cannot agree with this theory.

The legislature has provided I.C. § 50–311[2] as the method for municipal corpora-

resulting from the vacation of any street, avenue, alley or lane shall be determined under such terms and conditions as may be provided by the city council. Provided further that whenever any street, avenue, alley or lane shall be vacated, the same shall revert to the owner of the adjacent real estate, one-half (½) on each side thereof, or as the city council deems in the best interests of the adjoining properties, but the right of way, easements and franchise rights of any lot owner or public utility shall not be impaired thereby. In cities of fifty thousand (50,000) population or more in which a dedicated alley has not been used as an alley for a period of fifty (50) years [such alley] shall revert to the owner of the adjacent real estate, one-half (½) on each side thereof, by operation of law, but the existing rights of way, easements and

tions to follow when vacating an alley.[3] This statute empowers municipal corporations to "vacate [any alley] whenever deemed expedient for the public good ... [provided that] the right of way, easements and franchise rights of any lot owner or public utility shall not be impaired thereby." I.C. § 50–311. Idaho Code § 50–311 does not empower a municipal corporation to impose any conditions upon the vacation of an alley except for the proviso regarding impairment of the right of way, easements, and franchise rights of lot owners and public utilities.

In *Byrns v. City of Moscow*, 21 Idaho 398, 403, 121 P. 1034, 1036 (1912), this Court stated:

[W]e think that the constitution, art. 11, secs. 1 and 2, clearly confers power upon the legislature to provide for the incorporation, organization and classification of cities, and that such cities and towns shall have the power and authority given them by the laws enacted by the legislature. And where the legislature enacts laws providing the method to be adopted and followed by cities and villages in making local improvements, such cities and villages are required to pursue the methods and provisions of the law authorizing such improvements.

In *O'Bryant v. City of Idaho Falls*, 78 Idaho 313, 320, 303 P.2d 672, 674–75 (1956), we held that municipal corporations have three sources of power and no others:

1. Powers granted in express words;

2. Powers fairly implied in or incident to those powers expressly granted; and

3. Powers essential to the accomplishment of the declared objects and purposes of the corporation.

This Court has recently reiterated this rule in *Alpert v. Boise Water Corp.*, 118 Idaho 136, 142, 795 P.2d 298, 304 (1990). ("Municipal corporations in Idaho may exercise only those powers granted to them by the state Constitution or the legislature.")

A city ordinance that is in conflict with a state law of general application is invalid. *Mix v. Board of Cty. Comm'rs*, 18 Idaho 695, 112 P. 215 (1910). *See also Garten Enter., Inc. v. Kansas City*, 219 Kan. 620, 549 P.2d 864 (1976); *Lakewood Pawnbrokers, Inc. v. City of Lakewood*, 183 Colo. 370, 517 P.2d 834 (1973); *Application of Anamizu*, 52 Hawaii 550, 481 P.2d 116 (1971); and *City of Libby v. Haswell*, 147 Mont. 492, 414 P.2d 652 (1966). This Court has defined "general laws" to be "provisions of the Constitution, acts of the state legislature and the Constitution and laws of the United States." *State v. Clark*, 88 Idaho 365, 375, 399 P.2d 955, 960 (1965).

Idaho Code § 50–311, which applies to all municipal corporations in the state of Idaho and is an act of the state legislature, is clearly a state law of general application. It provides the method for municipal corporations to follow in vacating alleys. The two conditions that the City of Ketchum imposed upon vacation of the alley, as well as the right of reversion should a certificate of occupancy not be issued, are not expressly granted powers, fairly implied powers from the clear language of I.C. § 50–311, nor are they powers essential to the vacation of the alley. The *only* condition that I.C. § 50–311 allows upon a finding of expedience for the public good is that the vacation cannot impair "the right of way, easements and franchise rights of any lot owner or public utility." I.C. § 50–311. Thus, the two above-listed conditions, as well as the right of reversion, are *ultra vires* acts by the City of Ketchum because they conflict with I.C. § 50–311. *Mix*, 18 Idaho at 704–05, 112 P. at 218.

Because we hold the conditions and right of reversion to be beyond the authority of the City of Ketchum, it is necessary to address whether only those portions of the

franchise rights of any lot owner or public utility shall not be impaired thereby.

3. The City of Ketchum commingles the Local Planning Act, title 67, chapter 65, Idaho Code, with the argument concerning the power to impose conditions upon the vacation of an alley. The Local Planning Act, however, deals with zoning powers. The situation that we face is the vacation of an alley, to which the legislature has specifically spoken in I.C. § 50–311.

ordinance are invalid or whether the entire ordinance is null and void.

 Section 5 of Ordinance Number 471 is a savings and severability clause, providing that if a court should find a provision of the ordinance to be invalid, the remainder of the ordinance shall continue in full force and effect. In addition, the Blacks argue that if a portion of an ordinance is not an integral or indispensable part of the measure, then that part alone may be invalidated without affecting the remainder. For authority, the Blacks cite *Voyles v. City of Nampa,* 97 Idaho 597, 548 P.2d 1217 (1976).

Section 1 of Ordinance Number 471 states that "it is found by the Ketchum City Council to be in the best interest of the City of Ketchum and for the public good and convenience, *provided that the motel ... is built,* that said portion of said alley hereinafter be vacated." (Emphasis added.) The only "public good" found by the City of Ketchum in Ordinance Number 471 was the construction of the motel.

So, the City of Ketchum found that it was expedient for the public good to vacate the alley *if* the motel was built. Additionally, the parties do not dispute that the public good requirement would be satisfied by construction of the motel. In fact, in the estoppel affidavit, the Blacks acknowledged that "[w]e understand the City of Ketchum has determined that, provided the motel is constructed, the alley is not needed as a public thoroughfare." The problem, then, with striking only the two conditions and the right of reversion from the ordinance is that the statutorily mandated finding of "expedient for the public good" would be defeated. However, we are unable to discern, from this record, whether there was some other independent basis for the public good requirement. For this reason, we reverse the judgment of the district court and remand the case to the trial court to determine if other factors existed

or were considered regarding the public good requirement of I.C. § 50–311.[4]

## II.

### Did The District Court Err In Awarding Attorney Fees To The City Of Ketchum?

 The Blacks contend that the district court erred in awarding $8,297.25 in attorney fees to the City of Ketchum. Specifically, the Blacks point to the failure of the district court to make findings regarding the award and to designate a rule or code section pursuant to which the fees were awarded.

Idaho Rules of Civil Procedure 54(e)(1) and 54(e)(2) require the district court to make findings of fact before awarding attorney fees. In addition, I.R.C.P. 54(e)(1) requires that the case be brought "frivolously, unreasonably or without foundation" before attorney fees may be awarded. When the district court grants attorney fees to the prevailing party, I.R.C.P. 54(e)(3) requires the district court consider certain factors. In the present case, the district court made no written findings regarding its award of attorney fees to the City of Ketchum. The only indication that attorney fees were addressed appears in the court minutes of June 10, 1991, wherein it is written "case frivolous & unreasonable."

 While an award of attorney fees is within the "unique expertise and discretion" of a trial court, such an award cannot be sustained "where the record itself discloses that the claim was not frivolously pursued." *J.M.F. Trucking v. Carburetor & Electric of Lewiston,* 113 Idaho 797, 799, 748 P.2d 381, 383 (1987). The district court based its summary judgment upon a contract theory. We have found the district court's reasoning to be incorrect. Instead, we agree with the Blacks that the condi-

---

**4.** We take note of the Black's argument that if the conditions were proper under Idaho law, they would need to have been set forth in the short title in order to be effective. Idaho Code § 50–902 provides that "[i]n preparation, passage and publication, ordinances shall contain

no subject which shall not be clearly expressed in the title...." It is clear that the *subject* of the ordinance is vacation of an alley, and that subject is clearly expressed in the title: "AN ORDINANCE ... VACATING THAT PORTION OF THE ALLEY...."

tions and right of reversion attached to Ordinance Number 471 are *ultra vires.* We affirm the decision of the district court only insofar as the ordinance did not vacate the alley. Had the conditions and right of reversion not been an integral and indispensable part of the ordinance, we could have invalidated only those portions and saved the rest. Our review of the record, therefore, reveals that the case was not brought frivolously, unreasonably, or without foundation, but that it instead was pursued upon a meritorious, reasonable, and well founded legal theory. We therefore vacate that portion of the district court's judgment awarding $8,297.25 in attorney fees to the City of Ketchum.

▆ Finally, the City of Ketchum requested attorney fees on appeal. However, we are not left with "the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably or without foundation." *Minich v. Gem State Dev., Inc.,* 99 Idaho 911, 918, 591 P.2d 1078, 1085 (1979). We decline to award attorney fees on appeal to the City of Ketchum.

For the foregoing reasons, we vacate that portion of the judgment awarding attorney fees to the City of Ketchum, and reverse and remand the remaining judgment for further consideration consistent with this opinion regarding the public good requirement of I.C. § 50–311.

No costs on appeal.

BAKES, C.J., and REINHARDT, J., Pro Tem, concur.

BISTLINE, Justice, concurring in part and specially concurring.

## PART I.

There is much in Justice McDevitt's opinion with which I can readily agree. Moreover the thrust and tenor of his analysis of the heart of the controversy is commendable in that he immediately recognizes that the district court's decision, the *entry of a summary judgment based upon a contractual theory,* was incorrect.[5] At 309, 834 P.2d at 311 (1992). Likewise, I readily agree with his conclusion that the Blacks' complaint initiating the action was brought upon a meritorious, reasonable, and well-founded legal theory.

## PART II.

### A. A Brief Resume of the History of This Litigation.

Glen and Peggy Black,[6] had a plan for a development in downtown Ketchum, a plan which in the past forty years had not occurred to anyone else. It was a good plan, and it was their plan. The first phase of that plan was to acquire real property sufficient in area to accommodate a motel. They did so without any problem. The real estate which they acquired included ancient buildings and other improvements. Their acquired real property abutted on both sides of an alley. The Blacks had retained the services of a local architect who pre-

---

**5.** The judgment was invalid because it was not just incorrect, it was wholly unsubstantiated by any *ratio decidendi,* and hence erroneous in its succinct entirety. Moreover, there was not a trial as such, the parties apparently being agreeable to submitting the cause for a final decision on cross-motions for summary judgment. Thus the trial judge was deprived of any opportunity to consider the credibility of witnesses by observations of demeanor and candor. Neither party demanded a jury trial.

The amended complaint of the plaintiffs was filed on December 3, 1990; the answer was filed on January 29, 1991, together with the defendants' motion for summary judgment and the supporting affidavit of the city planner for the city of Ketchum with attached exhibits "A" through "F." Exhibit "C" is a copy of the Blacks' signed estoppel affidavit and "D" is a compilation of the minutes of council meetings on December 21, 1987, December 29, 1987, January 18, 1988, and February 16, 1988.

**6.** Nowhere in what has heretofore been written by the trial court or by this Supreme Court has there been any mention that Mr. & Mrs. Black were not merely fortune hunters bent on striking a bonanza. One gets the impression from reading the city council meeting minutes that such is a concern of some members, or perhaps, a mixed feeling of regret on the part of persons who, in retrospect have come to regret not having beaten the Blacks to the punch, or that the Blacks cannot accomplish their goal. The clerk's record clearly displays that the Blacks were issued a $2.5 million letter of credit by a reputable bank for financing this project.

pared the plans and specifications for the motel, which would be erected on the Blacks' property, and which would put the alley to a beneficial use, as contrasted to many previous years of no use, and apparently an eyesore. The Blacks were aware of statutory Idaho law which provides that alleys are subject to being vacated by a city council, or discontinued when deemed "expedient" which word, according to the dictionary has various definitions, one being "suitable for achieving a particular end." The particular end which the Blacks had in mind was to obtain the benefit of the statute, I.C. § 50–311, which provides that on the city's vacating an alley, "the same shall revert to the owner of the adjacent real estate, one-half (½) on each side thereof...." As noted above, the Blacks were legally entrenched in that respect by reason of being the sole owners of the real estate on *both* sides of the alley.

Accordingly, the Blacks requested of the council that the alley be vacated. No reason appears why that request would not be granted by means of an appropriate ordinance. However, the Blacks were forthright with the city council, and openly discussed the plans for the motel as being their reason for wanting the ordinance enacted. The Blacks attended council meetings where they were allowed to exchange points of view with attending council members. The Blacks soon learned, as the city clerk's minutes reflect, that the enacting of the ordinance vacating the alley was destined for problems, as attested to by statements made by city council members, clearly evidencing an attitude that some council members were open to negotiations to determine *what consideration* the city would receive from the Blacks in return for a city ordinance vacating the alley. Clearly, the Blacks were given to understand that they should not expect the city to gratuitously enact an ordinance vacating the unused alley. Pertinent portions of the minutes of the council meeting of December 21, 1987, adequately support the foregoing:

> This being the date and hour advertised for a Public Hearing upon the application of Glen Black to vacate a portion of the 20 foot wide alley between Lots 1, 2, 3,

and 5, 6 and 7, Block 1, Ketchum Townsite, May Seiffert opened the Public Hearing and asked for comments from the public.

Jim McLaughlin represented the applicant.

The P & Z Administrator said that the P & Z had considered the vacation at their last meeting and had recommended vacation subject to the Council determining if and what consideration would be reasonable for public benefit and also, subject to their enacting an Ordinance only if a valid permit is obtained for the motel. The portion of the alley proposed for vacation is behind Dick York on Main Street. The alley between the two remaining lots is taken up by the Sun Valley Motors building. Three letters were received. Letters from Barbara Oring and the merchants of Trail Creek Village supported the vacation. The third letter from Nicholas and Jan Cox expressed concern about the zoning and the impact on adjacent residential properties.

Mr. McLaughlin said that the alley has not been used for a number of years because Sun Valley Motors built a roof over it and used it as part of their facility. In order to build the motel complex that Mr. Black would like to put on the property and accomplish the underground parking required for that facility, it is necessary to build over what is currently dedicated as the alley. They are presently planning 61 units. They propose to preserve much of the frontal area for landscaping of Leadville. The building will be three stories with an entrance to the underground parking off River Street. The project will have its own laundry.

The City Administrator pointed out that one benefit to this type of development will be the City Sales Tax revenue that will be generated.

Council woman Orb *raised the question of compensation for the alley.*

The City Administrator said that there is an existing homestead cabin on the property which Mr. Black would like to give to the City if they want it. Alternatively

Mr. Black owns the service station and there are some gas pumps and hoists and the City can have first choice on them. The gas pumps themselves are not the type that the City uses but there may be some things that can be used.

Mr. Black said that he would like to see the cabin stay with the City. He said that he would do some research and if he can find anything out he will have a brass plaque made to place on the cabin wherever the City would like to place it. Councilman Young felt that the Council should try to formulate more of a policy than they have had in the past.

The City Administrator said that the only criteria is whether or not it is used for public transportation or is it likely to ever be used for public transportation. Alleys are normally used for access in the B-1 parking plan. They are used for access for garbage and service trucks when the development proposes to use both sides of the alley. The question is if there is no alley where do you provide an area for service deliveries.

Mr. McLaughlin said that in this case it will be off Leadville.

Councilman Held said that in this particular instance he has no problem with the client [sic, applicant] using the alley as long as he is doing underground parking and using the alley for access and if in Design Review he provides sufficient ingress and egress for service vehicles. *There is no problem as long as the City is compensated.* He would like the structure to stand on its own at Design Review. There is no problem as long as the *City can set up a formula for compensation.* He would not like to see the project held up for too long while this is done.

The City Administrator said that a water line and a sewer line will have to be abandoned. He has talked to the developer about this. *An appraisal can be done to establish the fair market value of the alley.*

Mr. Black did not feel that the value would be the same as buying a regular lot because of the irregular shape of the property. The alley is a long narrow piece of property which is landlocked. There is almost nothing else it can be used for.

Councilman Held indicated that he had *no problem with bartering,* however, he would like to do it at a public session. He felt that there should be a work session with staff input on what the land is worth. If the two pieces of property were separately owned, the alley would be valuable to the City for parking.

Edward Lawson suggested vacating the lot lines and creating one parcel.

Councilman Young asked the City Attorney if the City basically concludes that they no longer have use for an alley, *they can require compensation for it.*

The *City Attorney felt that there was a problem with selling an alley for compensation* which had heretofore been dedicated to public transportation. In the past the City has tried to gain the consent of those people that are on the remaining portion of the alley or street. In his mind the Statute is very vague with regard to the consent of adjoining property owners. If, however, anybody does sustain special damages they have to be compensated for them. In the past the City has tried to gain the consent of adjoining property (a) with regard to the vacation and (b) a statement saying that they will not be damaged by the vacation in order to avoid conflict. An Ordinance will have to be passed before the vacation becomes effective and if the Council wants to discuss *an approach to compensation* more discussion will be needed.

Councilman Held said that if there was going to be two separate buildings it would not be in the public interest to get rid of the alley. If there is only going to be one building the alley is not needed for transportation. He was concerned about the Council vacating the alley and then the developer building two separate buildings.

Mr. McLaughlin said that Mr. Black was willing to accept the construction of the motel as *a condition of the vacation.*

Mr. Black suggested that he sign an agreement to deed back or sign a quitclaim deed back to the City if construction is not started within a certain period of time.

The City Attorney pointed out that the adjoining property owners never held the alley. It was platted by the Federal Township.

Dick Fosbury suggested that in order to expedite things the *City take a donation* of the cabin and two hoists and then relocate the alley through the driveway.

The City Attorney was concerned about doing a review and seeing what courses of action have been thought appropriate in these instances and which ones have not been. *A true compensation package* cannot be worked out by next week. There being no further comments, Mayor Seiffert closed the Public Hearing.

Councilman Young moved to table the application of Glen Black to vacate a portion of the 20 foot wide alley between Lots 1, 2, 3 and 5, 6, and 7, Block 1, Ketchum Townsite until a special meeting scheduled for Tuesday, December 29, 1987 at noon and have staff contact Mr. Neyman to see if he gives his consent to the vacation. Councilman Held seconded the motion and the vote carried unanimously.

(Emphasis added.)

Astutely, the city attorney attempted to disabuse the council members of the notion that they were at liberty to exact money or other consideration from the Blacks as a requirement of giving their votes to vacate the alley, but to no avail. The minutes of the December 29, 1987, reveal the following:

The City Attorney discussed the public alley needed for the hotel project. Glen Black made an offer *to pay* the City of Ketchum *$5,000, donate* to the City of Ketchum any *salvageable material* from the Amoco station, and move the old cabin to a location of the City's choice. The City Attorney stated that Idaho law has no provision empowering cities to *sell public rights of way.* The City Attorney stated, however, that *the City may accept donations* from private individuals who receive land because of vacations of public transportation corridors.
....

Councilman Held expressed concern that if the hotel was not built, that Black could sell the land in parcels and the City could lose the use of the alley. Councilpersons Held and Orb suggested writing a draft ordinance between the City of Ketchum and Glen Black....

Councilwoman Orb made a motion to vacate a portion of the 20 ft. wide alley between lots 1, 2, 3, and 5, 6, and 7, Block 1, Ketchum Townsite and direct staff to use language as approved if the alley reopens for public use....

(Emphasis added.) The February 1, 1988, council meeting continued discussion on the Blacks' plan:

The next item of business was consideration of the Replat of lots 1, 2, 3, 5, 6 and 7, Block 1, Ketchum Townsite—Glen Black lot line removal.

The City Administrator said that Mr. Black had had a problem with Ordinance No. 471 as drafted as it tied the vacation to Design Review approval 87–C28 and Mr. Black may be considering some revisions to that approval.

Mr. Black said that he has made some revisions and he will have to go back to Design Review. He feels that there is not much point going back through Design Review if he cannot get the Council's approval to vacate the alley first. He has connected the swimming pool to the building so that people will not have to go outside to get to it. The lobby has been moved from River Street to Main Street. The building has been stepped more to get a better profile. The end stairwell has been wrapped also to provide a better profile. The parking on River Street has been brought inside the property and a stone wall erected in front of it.

Jim McLaughlin, Mr. Black's architect, indicated the changes on the drawings.

Mr. Black indicated that the underground or covered parking will not be changed.

The Council was concerned about curb cuts on Main Street.

The City Administrator indicated that Mr. Black had no problems with the stipulation that the alley not be vacated until the Certificate of Occupancy is issued. Mr. Black said that he had talked to his potential lender. They had said that this is definitely a problem. If Mr. Black does not have clear title to the property before the start of construction they will not be able to consider a loan. As long as somebody else owns the land they will not be able to lend money on it. This could put the City in a bad position as Mr. Black's partner. He felt that the City was concerned about giving up the alley and then the project not being done. He felt that the sewer bound situation he had proposed mitigated this concern.

The City Administrator suggested not making the vacation effective until a Building Permit is issued.

Mr. Black felt that this might satisfy his lender. He pointed out that the City has the protection of P & Z to make sure that the alley is used as proposed.

The City Attorney said that he was concerned that the City would be doing indirectly what they could not do directly. He said that they could *impose a condition* that the alley be vacated only in the event that a certain structure is built which is why it should be tied to the Certificate of Occupancy. It is clear that the *City cannot simply sell an alley. Mr. Black's* statements that he *would post some sort of financial assurances* tied to the vacation of the alley and the Building Permit rather than the Certificate of Occupancy and that he would forfeit the monies posted could be argued indirectly that he sold the alley for $100,000. Then the alley would be gone. Mr. Black suggested having his attorney work directly with the City Attorney.

The Council left it that Mr. Black would go back to Design Review and the Attorneys would work something out and come back to the Council.

Councilwoman Wolford moved to table the Glen Black lot line removal until the project has been seen by Design Review and until Mr. Black's Attorney has talked with the City Attorney. Councilwoman Orb seconded the motion and the vote carried unanimously.

(Emphasis added.) Minutes from a meeting held on February 16, 1988, are as follows:

Consideration of the Replat of Lots 1, 2, 3, 5, 6, and 7, Block 1 Ketchum Townsite—Glen Black lot line removal and consideration of Ordinance No. 471 vacating that portion of the alley running through Block 1, Ketchum Townsite, adjacent to Lots 1, 2, 3, 5, 6, and 7.

The Planning and Zoning Administrator related the Planning and Zoning Commission's requirements regarding this issue.

A rather lengthy discussion ensued between the Council, Mr. Black and citizens regarding the parking plans (diagonal vs. perpendicular), the drive through (one way vs. two way), the addition of 5 additional feet of landscaped area adjacent to the sidewalk to create a barrier between the parking area and the road and the issue of vacating the portion of the alley running adjacent to these lots.

The City Attorney related the results of his research into this issue and made some recommendations.

After this lengthy discussion, Mr. Black stated that the *Council's requirements* are not acceptable and that he will postpone his plans for the time being.

(Emphasis added.)

Nothing in I.C. § 50–311 states, suggests, or even intimates that a city is entitled to any quid pro quo for performing its statutory duty on being requested by a property owner to vacate an alley, or a street for that matter. The law is the same throughout the state of Idaho. A city is not allowed to profit from performing any of its statutory legislative functions. Nor should any city official do so. Nevertheless, it is abundantly evident here that some of the council members were openly negative towards granting the Blacks a vacation of the alley *unless the city obtained something in return.* The Blacks full-well seeing how the wind blew,

made the "contributions." Thereafter the city council took appropriate actions of publishing notice and conducting a public hearing. By ordinance duly enacted by the council, the alley was vacated by Ordinance No. 471, approved on April 4, 1988.

In his presentation of the background which led up to legal action in district court, Justice McDevitt has stated as to the meeting on December 29, 1987, "the Blacks offered the City of Ketchum $5,000.00, an old log cabin on the property, and any salvageable material from the service station." At 303, 834 P.2d at 305. He also illustrates that on April 4, 1988, the "City Council unanimously adopted Ordinance 471, and that, on the same day, the Blacks signed the Estoppel Affidavit which provided that the *conditions of the ordinance* were acceptable to them and would not be challenged by them." At 304, 834 P.2d at 306. To the average person the foregoing recapitulation of those events may not raise an eyebrow. Be that as it may, experienced lawyers will readily see that exchange for what it was: in return for the beneficence of the city officials in providing an ordinance vacating an alley, which is part and parcel of their official duty, the Blacks were required to "donate" the aforementioned items, including an estoppel affidavit. It was clearly a situation of no donations and no estoppel affidavit, no ordinance. True, that extortion did not put so much as an ounce of silver in any officials' pocket, but, putting that aside, it was, nevertheless, on the part of Ketchum's governing officialdom, not a legitimate function. Moreover, it was unconscionable conduct. The Blacks had no alternative but to accede to the official voices who wanted to know: "What is in it for the City?"

Similar unconscionable conduct was condemned by Justice Shepard in *Lake v. Equitable Sav. & Loan Ass'n.*, 105 Idaho 923, 674 P.2d 419 (1983), where Equitable was loaning money to borrowers buying homes with mortgage money, conditioned on the borrowers "agreeing" to the inclusion of a due-on-sale clause which rendered due the entire balance of the note if the borrower was so brazen as to sell his home, no matter for what reason. To better understand "unconscionable conduct," one should obtain the benefit derived from Justice Shepard's views of such tactics in *Lake:*

I deem it important to review what is actually at issue. The lender here purports to be able to control entirely the property which stands as security for the loan. The lender, in its prepared document, forbids not only the transfer of title to the property, but also any *possession* thereof, by anyone other than the borrower. Insofar as the document is concerned, it governs all situations, is sweeping and all-inclusive. Taken literally, it prohibits the property owner from renting his property, from entering into a contract of sale, from making a gift, and perhaps even from a transfer upon his death. In short, the terms of the document cannot reasonably be viewed as anything but a complete and absolute prohibition upon the alienation of the property.

. . . .

At bottom, the instant case reduces to a question of whether Idaho courts, exercising their *equitable jurisdiction* in foreclosure actions, are to be bound by the provisions of a due-on-sale clause or whether they are, depending upon the circumstances, free and able to rule that such clauses are void or voidable as a matter of public policy as being unreasonable restraints on alienation or an *unconscionable advantage* to a lender resulting from a contract of adhesion. Put another way, the question becomes whether that contract clause, regardless of the benefit to the lender, results in widespread and adverse consequences to the general public.

*Lake,* 105 Idaho at 928, 674 P.2d at 424 (emphasis in original and supplied).

Another member of the Court who was not aware of Justice Shepard's views was meanwhile writing in a similar vein:

Almost thirty years ago two young attorneys, each with but five years of experience, confidently argued to this

Court, then comprised of Justices Taylor, Porter, Givens, Thomas and Keeton, that penalties under the guise of liquidated damages in executing real estate purchase contracts were in fact penalty and hence against public policy and should be so declared. The confidence so placed was not in the ability of counsel, but rather confidence in that Court. That confidence was not misplaced. *Graves v. Cupic*, 75 Idaho 451, 272 P.2d 1020 (1954). Presented with the opportunity to rule on the practice of enforcing forfeitures or penalties against defaulting contract debtors, under whatever guise, this Court, as then constituted, was unanimous in declaring that 'provision is for a penalty and is unenforceable,' and 'arbitrary and bears no reasonable relation to the damages which the parties could have anticipated....' 75 Idaho at 459, 272 P.2d at 1025.

Today the same Supreme Court, differently constituted one may be certain, disdains the opportunity to continue with the holding and philosophy of the *Graves–Cupic* Court and its *Graves–Cupic* doctrine which has not been followed for thirty years.

The contractual provision which is here at issue is readily comprehended. It allows the lender at its whim and fancy, to exact the penalty of increasing the interest rate by two percent in any event where the borrower does anything with his property other than remain in it. Ostensibly it is aimed primarily at sales subject to existing encumbrances, but its sweep is unlimited. Such provisions were unknown in the day of *Graves v. Cupic*, but there should be little doubt in the minds of anyone but that the five justices above named would have made short shrift thereof. Not only do times change, but courts change. Nonetheless, courts leave behind them the case law which they have made. I had always thought, until recent years at least, it was as incumbent upon supreme courts, as it is on district courts and magistrate courts, to adhere to case law, or overrule it.

It takes little reflection to see that the provision allowing the lender to unilaterally raise the interest charge two percent upon a transfer of the security real estate is nothing but a penalty. On the face of the instrument is nothing whatever attempting to justify the provision. It is facially an arbitrary provision, an unconscionable penalty. Applied it is an unconscionable penalty, capriciously inserted in the instrument, not bargained for, and arbitrarily imposable. The California Supreme Court in a case which is somewhat a hybrid of *Graves v. Cupic* and this case held unanimously:

'We believe, however, that whatever dangers of this nature might be deemed to exist in the abstract, they do not justify the *blanket* restraint on alienation which the automatic enforcement of "due-on" clauses with respect to installment land contracts would involve. It is to be emphasized in this respect that in the case of the installment land contract the vendor retains legal title until the purchase price has been fully paid. Thus in the normal case the vendor, having received a small down payment and retaining legal title, has a considerable interest in maintaining the property until the total proceeds under contract are received; in this he differs markedly from the vendor of property where there has been an outright sale.

'It is true, of course, that from the point of view of the holder of the first lien, this interest of the trustor-vendor in the maintenance of the subject property cannot be fully equated within the interest of the trustor-vendor who *himself* remains in possession. It is also true that the former type of interest tends to decrease as the vendee's equity in the property increases through continued payments. But these factors do not in themselves justify the oppressive restraint on alienation which would result from automatic enforcement of the "due-on" clause whenever an installment land contract affecting the security is entered into.

'For the foregoing reasons we hold that a "due-on" clause contained in a promissory note or deed of trust is not to be enforced simply because the trustor-obligor enters into an installment land contract for the sale of the security. Rather, in such a case the clause can be validly enforced only when the beneficiary-obligee can demonstrate a threat to one of his legitimate interest sufficient to justify the restraint on alienation inherent in its enforcement.

*Lake,* 105 Idaho at 931–32, 674 P.2d at 427–28 (emphasis in original).

In retrospect, one would like to think that when Shepard, J. and Bistline, J. were both of the same mind, that the other members of the Court might pause to consider carefully before joining or remaining with a contrary opinion.

B. A Short Course on Idaho Code § 50–902, and Constitutional Law.

It is well established that the title of an ordinance has been deemed of utmost importance, and that the text of the ordinance must not go beyond the encompassment of the title. Idaho Code § 50–902 in clear language provides, *"In preparation, passage and publication, ordinances shall contain no subject which shall not be clearly expressed in the title."* (Emphasis added.)[7] Over and above the legislative provisions of I.C. § 50–902, there are, of course, even stronger admonitions, i.e., the mandatory provisions of art. 3, § 16 of the Idaho Constitution:

§ 16. Unity of Subject and Title.—Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be embraced in the title.

As is readily observed, there is considerable language in Ordinance No. 471, which does not appear in the title. The title contains only this, and nothing more:

ORDINANCE NUMBER 471

AN ORDINANCE OF THE CITY OF KETCHUM, BLAINE COUNTY, IDAHO, VACATING THAT PORTION OF THE ALLEY RUNNING THROUGH BLOCK 1 ADJACENT TO LOTS 1, 2, 3, 5, 6, AND 7, THEREOF, AS SHOWN ON THE PLAT OF THE ORIGINAL TOWNSITE OF KETCHUM; AND, ORDERING CONVEYANCE TO ADJACENT PROPERTY OWNER; PROVIDING A REPEALER CLAUSE; PROVIDING A SAVINGS AND SEVERABILITY CLAUSE; AND, PROVIDING AN EFFECTIVE DATE.

BE IT ORDERED BY THE MAYOR AND CITY COUNCIL OF THE CITY OF KETCHUM, BLAINE COUNTY, IDAHO ...

Turning to Section 1 of the ordinance, and removing therefrom the extraneous language which is foreign to the title and purports to attach a condition to the ordinance, it is clearly apparent that certain of the language therein contained is void per art. 3, § 16 of the Idaho Constitution and per Idaho Code § 50–902. *With the void language removed,* Section 1 reads:

SECTION 1. That upon the Ketchum City Council having obtained the written consent to said vacation from the property owners adjoining said portion of the alley running through Block 1 of Ketchum Townsite adjacent to Lots 1, 2, 3, 5, 6, and 7, thereof, and having held a public hearing before the Ketchum City Council upon notice as required by law, it is found by the Ketchum City Council to be in the best interest of the City of Ketchum and for the public good and

---

7. That mandatory direction of the legislature to city governments is not new at all, but has been in the books since statehood. Idaho Revised Code of 1908, § 2276, at page 954, provides in its final sentence, "Ordinances shall contain no subject which shall not be clearly expressed in their title, and no ordinance or section thereof shall be revised or amended unless the new ordinance contain the entire ordinance or section as revised or amended, and the ordinance or section so amended shall be repealed." It was first enacted by the laws of 1893, § 79, at page 97.

convenience; . . . that said portion of said alley hereinafter described be vacated; that no damage results to any adjoining property owners or anyone else; that . . . there is no need for said portion of said alley as a public thoroughfare as properties on all sides of said alley have access from a public street or streets; that said alley has never been opened, improved or maintained within the platted right-of-way by the City of Ketchum and to do so would be unnecessary; and, that vehicular circulation in the vicinity is in no way affected by said vacation.

Section 2 of Ordinance No. 471, with the void language removed therefrom by application of the same constitutional and statutory provisions, is narrowed to the following:

[T]he portion of the alley running through Block 1, as shown on the Official Plan of the Original Townsite of Ketchum, Idaho, being more particularly described as the one hundred sixty-five feet (165' in length and twenty feet (20') in width of said alley adjacent to Lots 1, 2, 3, 5, 6, and 7, Block 1, Official Plat of the Original Townsite of Ketchum IS HEREBY VACATED.

Section 3 in its entirety is void because it is not in the slightest encompassed in the title of Ordinance No. 471. Moreover, it appears that, as to any supposed reversion of the alley coterminous with the specified seven lots in Block 1, Ketchum Townsite, such would enure to the benefit of the Blacks. Their ownership of the lots is unquestioned.

"SECTION 4. REPEALER CLAUSE. All ordinances of parts thereof in conflict herewith are hereby repealed." Section 4, may not be constitutionally void, or statutorily infirm, because it does appear in the title of the ordinance. However, it is not seen that the city places any reliance upon Section 4's declaration that "all ordinances or parts thereof in conflict herewith are hereby repealed," such ordinances or parts thereof being wholly unspecified, undes-

ignated, and unknown. Section 4 is a nullity and of no consequence in this litigation. The defendants did not place any reliance on Section 4 in the skirmishes which took place in the trial court.

SECTION 5. SAVINGS AND SEVERABILITY CLAUSE. If any section, paragraph, sentence or provision hereof or the application thereof to any particular circumstances shall ever be held invalid or unenforceable by a Court of competent jurisdiction, *such decision shall not affect the remainder hereof,* which shall continue in full force and effect and applicable to all circumstances to which it may validly apply.

(Emphasis added.) Section 5 is a literary gem, the likes of which are seldom seen. Section 5 recognizes the probability that there are contained in Ordinance No. 471, sections, paragraphs, or provisions which may be held invalid or unenforceable by a Court of competent jurisdiction. Apparently no such circumstances materialized in the controversy *as decided by the trial court* in ruling on cross-motions for summary judgment.

Section 6 states with specificity: "EFFECTIVE DATE. This ordinance shall become effective upon its passage, approval and publication according to law. *Passed by the Ketchum City Council and approved by the Mayor this 4th day of April, 1988."* The ordinance was approved under the signature of mayor Lawrence J. Young, and attested to by city clerk Betty A. Coles. That ordinance was effective on passage. Therefore, by operation of law, I.C. § 50–311, the ownership of the alley devolved unto Glen and Peggy Black.[8] All of the *ultra vires* terms and conditions inserted into the ordinance are, by virtue of the Idaho Constitution, rendered *void.* That which is void is of no legal effect, or, more simply, it isn't there.

Administration of justice is the goal of this Court. It has taken the appropriate action today in reversing and remanding this cause to the district court.

---

**8.** Contained in I.C. § 50–311, is this language: "Provided further than whenever any street, avenue, alley or lane shall be vacated, the same shall revert to the owner of the adjacent real estate, one-half (½) on each side thereof. . . ."

JOHNSON, Justice, concurring and dissenting.

I concur with the portion of the Court's opinion holding that the conditions and right of reversion contained in the ordinance were beyond the authority of the City of Ketchum, and with the portion vacating the award of attorney fees. I respectfully dissent from the portion of the Court's opinion remanding the case to the trial court. In my view, the condition requiring the motel to be built is an integral and indispensable part of Ordinance No. 471. I would invalidate the entire ordinance and reverse.